Erik A. Christiansen (USB #7372)
Brian M. Rothschild (USB #15316)
PARSONS BEHLE & LATIMER
One Utah Center
201 South Main Street, Suite 1800
P.O. Box 45898
Salt Lake City, UT 84145
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
Email: EChristiansen@parsonsbehle.com
Email: BRothschild@parsonsbehle.com

Steven C. Sunshine (*pro hac vice* pending)
Clifford M. Sloan (*pro hac vice* pending)
Maria Raptis (*pro hac vice* pending)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue NW
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
Email: Steve.Sunshine@skadden.com
Email: Cliff.Sloan@skadden.com
Email: Maria.Raptis@skadden.com

*Attorneys for Plaintiff Bausch & Lomb Incorporated*

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| BAUSCH & LOMB INCORPORATED,<br><br>      Plaintiff,<br><br>v.<br><br>SEAN D. REYES, in his Official Capacity as Attorney General of Utah,<br><br>      Defendant. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. 2:15-cv-00259-DAK<br><br>Judge: Dale A. Kimball |

4811-6342-6851.1

Plaintiff Bausch & Lomb Incorporated ("B+L") hereby brings this Complaint against Sean D. Reyes, in his official capacity as the Attorney General of Utah, and alleges as follows:

## INTRODUCTION

1. Motivated by a parochial desire to protect a major in-state business at the expense of a targeted class of out-of-state corporations, the State of Utah ("State") enacted S.B. 169, which amends the Contact Lens Consumer Protection Act. *See* S.B. 169, 2015 Gen. Stat. § 2(2). The bill imposes sweeping prohibitions on national contact lens manufacturers in their business activities across the country. It strips the manufacturers of ordinary business discretion to determine their business relationships by prohibiting manufacturers from "discriminating" against potential commercial partners based on the potential partners' business practices and by prohibiting "any action" by the manufacturers, regardless of market forces or consumer benefits, that "has the effect" of "controlling" prices for the manufacturers' products. The prime beneficiary of this far-reaching intrusion into national business practices—as explicitly recognized by the Utah legislature—is 1-800-CONTACTS, a Utah-based company that is the largest distributor of contact lenses in the nation, with sales to consumers in all fifty states.

2. S.B. 169 is an extraordinary intrusion into interstate commerce conducted by out-of-state businesses, in clear violation of settled principles of Commerce Clause jurisprudence. *First*, as an economic protectionist measure that blatantly favors an in-state contact lens distributor while burdening out-of-state contact lens manufacturers, S.B. 169 discriminates against interstate commerce and is *per se* invalid. *Second*, the putative local benefits of S.B. 169 are far outweighed by the severe burdens on interstate commerce—

4811-6342-6851.1

particularly because the type of nationwide business practices and discretion prohibited by the new legislation have recently been praised by the United States Supreme Court as having a wide range of benefits for competition and consumers.  ***Third***, through its expansive scope and extraterritorial effect, S.B. 169 impermissibly regulates extensive commercial activity that occurs outside the boundaries of the State.

3. B+L accordingly seeks a declaration that S.B. 169 violates the Commerce Clause of the Constitution, art. I, § 8, cl. 3, and an injunction barring its enforcement.

## JURISDICTION

4. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because the claims arise under the Constitution and laws of the United States.  This Court may award relief pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

## VENUE

5. Venue is proper in this District under 28 U.S.C. § 1391(b) because Attorney General Reyes is a resident of Utah and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

6. Plaintiff B+L is a wholly owned subsidiary of Bausch & Lomb Holdings Incorporated, which is indirectly but wholly owned by its parent, Valeant Pharmaceuticals International, Inc.  B+L is a New York corporation with its principal place of business in Bridgewater, New Jersey.  B+L manufactures and offers for sale an array of contact lens

products, including technologically advanced hydrogel lenses.  It is the fourth leading producer of contact lenses.  B+L has no significant operations based in Utah.

7. Defendant Sean D. Reyes is sued in his official capacity as the Attorney General of Utah.  S.B. 169 authorizes the Attorney General of Utah to bring a civil action or to seek an injunction and civil penalty against any person who violates the provisions of that law.

## STATEMENT OF FACTS

**A.     The Contact Lens Market**

8. An estimated 36 million people in the United States wear contact lenses to correct vision.  Soft lenses make up over 90 percent of the contact lens market and are used to correct a variety of vision problems.

9. Four companies produce almost all contact lenses sold within the United States: Johnson & Johnson Vision Care, CIBA Vision (Alcon), CooperVision, and B+L.  Upon information and belief, none of these manufacturers is located or has significant operations based in Utah.

10. Manufacturers generally distribute contact lenses to a variety of retailers, including mass retailers, national optical chains, regional optical chains, online suppliers, and independent retailers.  Online outlets, mass retailers, and some national chains purchase lenses directly from manufacturers and then resell them to individuals throughout the country.  Many national chains, regional chains, and independent retailers buy lenses predominantly through wholesale distributors.

11. 1-800-CONTACTS, a Utah-based corporation, is the leading online retailer of contact lenses and sells approximately 10 percent of contact lenses sold nationwide.

B.  **The Role of Eye Care Professionals**

12. Eye care professionals play a critical role in the purchasing decisions of their patients. Eye care professionals include ophthalmologists, optometrists, and opticians. Because of the vast range of needs and options available for contact lens wearers, eye care professionals assist patients by identifying the optimal kind of contact lens for each patient and giving the patient the appropriate prescription. Eye care professionals also instruct patients as to proper care for lenses and are available to the wearer for routine and emergency care.

C.  **B+L's Contact Lens Products**

13. B+L is the fourth leading producer of contact lenses, accounting for less than 10 percent of overall sales. In the soft lens market, B+L accounts for less than 5 percent of overall sales.

14. To improve its position in the marketplace and provide innovative and helpful products for patients, B+L has spent years developing silicone hydrogel, hydrogel, and novel lens designs that it believes represent a technological breakthrough that will address the needs of today's contact lens wearers better than any other product on the market.

15. B+L recently launched BAUSCH + LOMB ULTRA contact lenses, which are made from a new type of silicone hydrogel material. BAUSCH + LOMB ULTRA lenses harness technological advances to produce a contact lens with clearer vision and greater comfort.

16. B+L also introduced BioTrue contact lenses, which use a novel hydrogel material. The lenses are intended to be worn by patients seeking an alternative to silicone (which might not be suitable for all contact lens wearers).

D.     **Procompetitive Benefits of Manufacturer Pricing Policies**

17.    Economists and courts have recognized that granting manufacturers discretion to set pricing policies generates procompetitive benefits and produces outcomes favorable to businesses and consumers alike.

18.    A recent Supreme Court decision lauded the procompetitive virtues of manufacturers' discretionary pricing arrangements.  In *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), the Court observed that "economics literature is replete with procompetitive justifications for a manufacturer's use" of policies that influence the prices of its products.  *Id.* at 889.

19.    Manufacturers' pricing policies further "the primary purpose of the antitrust laws" by promoting interbrand competition, i.e., competition between manufacturers selling different brands of the same type of product.  *Id.* at 890 (internal quotation marks and citation omitted).  Interbrand competition, in turn, provides more options in the market to choose products based on the preferred combination of price and quality; facilitates market entry for new firms and brands, which is "essential to a dynamic economy," *id.* at 891; and assists manufacturers by encouraging retailers to invest in efforts to bolster their position against rival manufacturers.

20.    Discretionary pricing policies also eliminate free riding.  Without discretionary pricing policies, retailers who furnish services and persuade consumers to purchase a product could fail to benefit from the increased demand generated from those services when consumers purchase a product for less at a discount retailer, who contributes no effort to increase the demand.

### E. B+L's Adoption of Pricing Policy

21. Recognizing these procompetitive benefits of pricing policies, in 2014 B+L adopted a pricing policy for two of its new innovative contact lens products, BAUSCH + LOMB ULTRA and BioTrue ONEday for Presbyopia. The policy states that B+L will not supply those lenses to customers who sell or advertise the lenses for less than a specified price ($60 for a six pack of BAUSCH + LOMB ULTRA lenses and $33 for a thirty pack of BioTrue ONEday for Presbyopia lenses).

22. The policy is carefully circumscribed, as it applies only to two specific lines of new and innovative products. The policy also is unilateral and makes clear that resellers are free to set their own resale prices, while B+L also will exercise its own discretion about its potential commercial partners in a structured fashion. The policy, moreover, allows for certain discounts mandated by insurance and eye health plans.

### F. Procompetitive Benefits of B+L's Pricing Policy

23. B+L's pricing policy encourages eye care professionals to invest time in education and services, thereby encouraging adoption of the new products covered by the policy and facilitating competition with the leading contact lens manufacturers.

24. B+L's pricing policy encourages greater adoption of BAUSCH + LOMB ULTRA and BioTrue ONEday for Presbyopia lenses through superior service and quality. These attributes are valued by doctors and patients alike. Consumers, in particular, will benefit from a better contact lens wearing experience and continued involvement by doctors in their care and long-term eye health.

25. Greater commercial success for BAUSCH + LOMB ULTRA and BioTrue ONEday for Presbyopia will, in turn, lead to increased competition and greater investment by contact lens manufacturers in new products and technology. This increased competition and introduction of new products will lower prices and improve quality, benefiting consumers.

### G. Enactment of S.B. 169

26. From the outset, protecting the business interests of Utah-based 1-800-CONTACTS was inextricably linked with the passage of S.B. 169. A vice president of 1-800-CONTACTS accompanied the sponsoring senator to the Senate and House to assist with the introduction of S.B. 169 to each legislative body. The vice president of 1-800-CONTACTS shared speaking time with the sponsoring senator, advocating in favor of passage of the bill.

27. Comments on the House floor during debate over S.B. 169 reinforced the notion that protecting local economic interests was a core aim of the bill. One legislator emphasized that 1-800-CONTACTS "is a company I think we all revere . . . and are pleased to have in our state. It provides economic strength, jobs for our population, and . . . I've been proud to say that 1-800-CONTACTS is within the borders of the state of Utah." Utah State Legislature, *House Floor Video, Day 43*, Mar. 10, 2015, at 2:09:47–2:10:19, *available at* http://utahlegislature.granicus.com/MediaPlayer.php?clip_id=18885&meta_id=551207. But, he cautioned, "[t]here are things going on in the . . . market that are obviously disruptive to their business model." *Id.* Enforcing S.B. 169 would alleviate these purported disruptions.

28. Similarly, during the Senate committee consideration of the proposed legislation, one Senator emphasized the importance of the fact that the legislation would benefit a "Utah-based" company, 1-800-CONTACTS. Utah State Legislature, *Senate Business and Labor*

8

*Committee*, Feb. 17, 2015, at 50:39–50:40, *available at* http://utahlegislature.granicus.com/MediaPlayer.php?view_id=2&clip_id=18415&meta_id=2377 94. He also explained that the bill was "targeted" to help 1-800-CONTACTS; observed that banning the business policies of manufacturers addressed by the bill could be justified because they "undercut 1-800-CONTACTS, a Utah-based business"; and referred to the proposed legislation as part of an ongoing "turf battle" between 1-800-CONTACTS and an out-of-state contact lens manufacturer. *Id.* at 49:46–50:43. Still another senator stressed that the full Senate would need to address the issues raised, including the role of a "home grown" company in the adoption of the legislation. *Id.* at 47:44–48:11.

29. Members of the legislature also understood that, in contrast to the major in-state business that would prosper as a direct result of S.B. 169, the bill would harm only out-of-state businesses. This is because the bill was explicitly aimed at the pricing policies of the four major contact lens manufacturers, *see id.* at 04:14–04:31; *see also House Floor Video, Day 43*, at 2:25:08–2:25:13, 2:30:58–2:31:01, each of which is located out of state.

30. The legislature ultimately enacted S.B. 169, which the Governor signed into law on March 27, 2015. The full text of S.B. 169 provides as follows:

> A contact lens manufacturer or contact lens distributor may not:
>
> (1) take any action, by agreement, unilaterally, or otherwise, that has the effect of fixing or otherwise controlling the price that a contact lens retailer charges or advertises for contact lenses; or
>
> (2) discriminate against a contact lens retailer based on whether the contact lens retailer:
>
> > (a) sells or advertises contact lenses for a particular price;

9

       (b)     operates in a particular channel of trade;
       (c)     is a person authorized by law to prescribe contact lenses; or
       (d)     is associated with a person authorized by law to prescribe contact lenses.

The bill authorizes the Attorney General of Utah to "bring a civil action or seek an injunction and a civil penalty against any person who violates" the pricing restrictions.

31. By its terms, S.B. 169 directly regulates transactions between contact lens manufacturers, distributors, retailers, and consumers—no matter whether they have any nexus to Utah—so long as, presumably, any business in the distribution chain or any consumer is located in Utah. An out-of-state manufacturer transacting with out-of-state businesses faces the prospect of possible civil liability if it fails to comply with S.B. 169's sweeping prohibitions and the product ultimately makes its way to a consumer or retailer in Utah. Similarly, a manufacturer who sells to a distributor in Utah, who then resells to consumers in the other forty-nine states, likewise faces the prospect of possible civil liability if it fails to comply with the State's new contact lens regime.

32. S.B. 169 is scheduled to go into effect on May 12, 2015. If S.B. 169 goes into effect, it will irreparably harm B+L because the damages caused to B+L will be unquantifiable or difficult to calculate, enforcement also will cause intangible harms to B+L, and sovereign immunity will preclude B+L from recovering any damages.

## COUNT I
**(Discrimination Against Interstate Commerce in Violation of the Commerce Clause)**

33. B+L incorporates by reference all allegations contained in paragraphs 1 through 32 of this Complaint.

34. A state law violates the dormant Commerce Clause when it benefits in-state economic interests by discriminating against out-of-state economic interests. Laws falling under this rubric are virtually *per se* invalid.

35. S.B. 169 greatly benefits in-state contact lens retailers, such as the conspicuous, explicitly recognized example of 1-800-CONTACTS, and burdens four identified out-of-state businesses and denies the out-of-state businesses the customary business discretion to set pricing policies and select commercial partners. In so doing, the bill allows in-state retailers, such as 1-800-CONTACTS, to free ride off of the services provided by eye care professionals. Eye care professionals' investment of time and other resources to learn about new contact lens products will lead to increased demand for those products among consumers. Some consumers will purchase those products from discount retailers, such as 1-800-CONTACTS, who offer discounted prices because they do not invest in expertise to understand innovative products and generate increased demand. As the legislative history explicitly demonstrates, the State enacted S.B. 169 to protect the business model of 1-800-CONTACTS as a successful in-state company.

36. At the same time, S.B. 169 explicitly burdens out-of-state businesses. The bill frustrates efforts by contact lens manufacturers to use pricing policies to develop and introduce new products, increase demand for their products, and ultimately benefit consumers. As the legislature recognized, there are only four major contact lens manufacturers that would be harmed by the bill. All are located outside the State.

37. Because S.B. 169 is an economic protectionist measure that discriminates against interstate commerce and there are no extraordinary circumstances justifying its adoption, it violates the Commerce Clause.

## COUNT II
### (Imposition of Burdens on Interstate Commerce That Clearly Outweigh Local Benefits, in Violation of the Commerce Clause)

38. B+L incorporates by reference all allegations contained in paragraphs 1 through 37 of this Complaint.

39. A state law violates the dormant Commerce Clause if the burden that it imposes on interstate commerce is clearly excessive in relation to the putative local benefits.

40. S.B. 169 imposes far-reaching burdens on interstate commerce. It blocks out-of-state contact lens manufacturers, whose businesses involve almost exclusively interstate commerce, from adopting procompetitive measures to increase demand for their products and foster product development. It also directly regulates interstate commerce and transactions that take place outside of the State.

41. The local benefits secured by S.B. 169—if any—are comparatively minimal. First, the bill targets only conduct that has been hailed as procompetitive by courts and commentators. Although the State may attempt to justify the legislation based on its purported beneficial effects on consumers, in reality, as recognized by the Supreme Court in *Leegin*, the discretionary pricing policies in the crosshairs of S.B. 169 provide consumers more purchasing options and potentially lower prices through interbrand competition. Second, the majority of end-consumer transactions subject to the bill will involve out-of-state residents. The State has no legitimate interest in protecting nonresident consumers.

42. S.B. 169 violates the Commerce Clause by imposing burdens on interstate commerce that clearly outweigh the putative in-state benefits.

## COUNT III
### (Impermissible Extraterritorial Effect in Violation of the Commerce Clause)

43. B+L incorporates by reference all allegations contained in paragraphs 1 through 42 of this Complaint.

44. A state law violates the dormant Commerce Clause if it has an impermissible extraterritorial effect—either because it directly regulates interstate commerce or because it applies to transactions that take place wholly outside of the State's borders.

45. S.B. 169 has a sweeping extraterritorial reach. First, it directly regulates interstate commerce. The legislation is aimed at out-of-state companies whose products reach Utah companies or consumers. It imposes restraints on this interstate commerce, barring manufacturers from enacting policies to guide the pricing of their contact lenses and the selection of their commercial partners. Second, the effect of S.B. 169 is to control conduct beyond the boundaries of the State. The legislation's prohibition on pricing policies necessarily affects the terms of sales between out-of-state manufacturers and out-of-state distributors, and it affects the distribution of products to consumers in all fifty states. As a result, the legislation directly regulates transactions beyond the boundaries of Utah.

46. Because it has a sweeping extraterritorial reach, S.B. 169 violates the Commerce Clause.

## RELIEF REQUESTED

WHEREFORE, B+L respectfully requests that this Court take the following action:

(a) Declare that S.B. 169 is unconstitutional;

(b) Enjoin Defendant from enforcing S.B. 169;

(c) Award B+L attorneys' fees for prosecuting this action; and

13

      (d)      Grant B+L any other relief that the Court deems just and proper.

April 14, 2015                                                     Respectfully submitted,

 /s/ Erik A. Christiansen
Erik A. Christiansen
Brian M. Rothschild
PARSONS BEHLE & LATIMER
One Utah Center
201 South Main Street, Suite 1800
P.O. Box 45898
Salt Lake City, UT 84145
Telephone:  (801) 532-1234
Facsimile:  (801) 536-6111
Email:  EChristiansen@parsonsbehle.com

Steven C. Sunshine (*pro hac vice* pending)
Clifford M. Sloan (*pro hac vice* pending)
Maria Raptis (*pro hac vice* pending)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue NW
Washington, DC 20005
Telephone:  (202) 371-7000
Facsimile:  (202) 393-5760
Email:  Steve.Sunshine@skadden.com
Email:  Cliff.Sloan@skadden.com
Email:  Maria.Raptis@skadden.com

*Attorneys for Bausch & Lomb Incorporated*